# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| BILLAL I. DEKKAR | § | |
| | § | |
| V. | § | A-19-CV-517-LY |
| | § | (A-16-CR-159-LY) |
| UNITED STATES OF AMERICA | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:  THE HONORABLE LEE YEAKEL
  UNITED STATES DISTRICT JUDGE

Before the Court are Billal I. Dekkar's Motion to Vacate (Dkt. No. 87) and Supplemental Complaint (Dkt. No. 99-1, 100), and the associated responses and replies, as well as the Ex Parte Motion for Protective Order (Dkt. No. 90), and Dekkar's Request for Authorization of Discovery (Dkt. No. 93). The undersigned submits this Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Rule 1 of Appendix C of the Local Court Rules.

## I. GENERAL BACKGROUND[1]

Billal Dekkar was first prosecuted in this Court in 2013, in two cases. Both were resolved by guilty pleas. In the first, A-13-CR-211-LY, he was sentenced to 24 months of imprisonment, followed by three years of supervised release, for using an unauthorized access device, in violation of 18 U.S.C. § 1029(a)(2). He was also ordered to pay $424,971.09 in restitution to American

---

[1] The facts set out here are taken from the Court records and the filings in both this, and Dekkar's previous, criminal cases. When a prisoner files a § 2255 motion, the district court must grant an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *U.S. v. Samaniego*, 532 Fed. Appx. 531 (5th Cir. 2013) (citing § 2255(b)); *see also United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992) ("A motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief."). The Court finds that Dekkar is not entitled to a hearing because the motion, files, and record conclusively show that he is not entitled to relief.

Express. In the second case, A-13-CR-279, he was sentenced to 24 months of imprisonment, followed by one year of supervised release, for aggravated identity theft, in violation of 18 U.S.C. § 1028(a)(1). The two sentences were ordered to run concurrently. In 2015, Dekkar was placed by the Bureau of Prisons in a halfway house in Austin to serve the final months of this sentence. While residing at the halfway house, Dekkar was employed by Potbelly's, but was fired from that job when he was caught using a customer's credit card to pay for spa services. Neither the BOP nor the U.S. Probation office were made aware of this, however, and Dekkar completed his sentence without any sanction and began serving his term of supervised release in November 2015.

By this time Dekkar was already under investigation for new credit card and identity theft crimes. The Probation Office also suspected that Dekkar was violating the conditions of his supervision, and in February 2016, Dekkar was arrested on a warrant arising out of allegations he had violated the conditions of his supervised release. Dkt. No. 94 at 1. The agents investigating Dekkar and the Assistant United States Attorney working on the investigation informed Dekkar and his attorneys of the ongoing investigation, and offered Dekkar an opportunity to debrief regarding those matters. The terms of the meeting were set out in a proffer letter addressed to Dekkar's retained attorneys (Ben Florey and Olga Seelig), which Dekkar accepted and signed. Dkt. No. 94-2. Dekkar and his attorneys met with the Government, and in those meetings Dekkar admitted to new criminal conduct. He did not have his cell phone at the time of his arrest, nor did the Government locate it when it executed a search warrant at his residence in conjunction with the supervised release arrest. Thus, the Government informed Dekkar that full cooperation would require him to provide his cell phone to the Government. Dkt. No. 94 at 2. Dekkar agreed to do so, and the next day a defense investigator delivered Dekkar's cell phone to law enforcement officers.

In the meantime, Dekkar contested the allegations that he had violated his supervised release conditions, and an evidentiary hearing was held on the Probation Office's petition. Dekkar was represented at the hearing by the same counsel who had represented him on the debriefing session related to the new matters under investigation. After a hearing, the undersigned issued a Report & Recommendation finding that Dekkar had lied to the Probation Office regarding his employment and where he was residing, and recommended that his supervised release be revoked. Dkt. No. 75 in Case No. A-13-CR-211-LY. Judge Yeakel adopted the recommendation and on March 23, 2016, he entered a judgment revoking Dekkar's supervision in both cases, and sentencing him to a concurrent sentence of 5 months of imprisonment, followed by 31 months of supervised release. *Id.* at Dkt. No. 77.

While Dekkar was serving this sentence, he was indicted for eighteen new criminal charges—the indictment forming the basis of this case. Dkt. No. 1. In August 2016, at his request, Dekkar was provided with appointed counsel to represent him in the new case. Dkt. No. 11. Ultimately, Dekkar entered into a plea agreement with the Government, and on November 21, 2016, he pled guilty to two counts of a superseding indictment charging wire fraud in violation of 18 U.S.C. § 1343, and aggravated identity theft under 18 U.S.C. § 1028A. Dkt. Nos. 19 and 23. The guilty plea was entered in open court. *See* Dkt. No. 81. On May 1, 2017, Dekkar was sentenced to a total of 84 months of imprisonment, three years of supervised release, and was also ordered to pay $104,746.69 in restitution. Dkt. No. 71.

Dekkar appealed, contending that the conviction was the result of ineffective assistance of counsel, largely based on the actions of the counsel who represented him during the debriefing and supervised release revocation proceedings. The Fifth Circuit rejected the appeal, finding that the

record was insufficiently developed to allow for fair consideration of the ineffective assistance of counsel claim. *United States v. Dekkar*, 721 Fed. Appx. 382 (5th Cir. 2018). Dekkar thereafter timely filed this Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, alleging ineffective assistance of counsel and prosecutorial misconduct, focused again on the actions of the attorneys who represented him in the proffer session. Dkt. No. 87. Dekkar subsequently filed a Supplemental 2255 Complaint alleging a new ineffective assistance claim against the appointed attorney who represented him after indictment in this case. Dkt. No. 99-1 and 100.

## II. STANDARD OF REVIEW

Under § 2255, four general grounds exist upon which a defendant may move to vacate, set aside, or correct his sentence: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the District Court was without jurisdiction to impose the sentence; (3) the sentence imposed was in excess of the maximum authorized by law; and (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255. The nature of a collateral challenge under § 2255 is extremely limited: "A defendant can challenge his conviction after is it presumed final only on issues of constitutional or jurisdictional magnitude . . . and may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error." *United States v. Shaid*, 937 F.2d 228, 232 (5th Cir. 1991). If the error is not of constitutional or jurisdictional magnitude, the movant must show that the error could not have been raised on direct appeal and would, if condoned, "result in a complete miscarriage of justice." *United States v. Smith*, 32 F.3d 194, 196 (5th Cir. 1994). A defendant's claim of ineffective assistance of counsel gives rise to a constitutional issue and is cognizable pursuant to § 2255. *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1996).

**III. ANALYSIS**

Dekkar raises four general grounds seeking relief in this motion. First, he contends that his attorneys were deficient in relation to the proffer agreement and advising him to participate in the debriefing. Second, he contends that his attorney was deficient in providing his cell phone to the Government, and contends it was done without his consent. Third, he alleges that the prosecutor engaged in misconduct by retaliating against Dekkar in this case for Dekkar insisting upon a hearing to contest the supervised release allegations in his prior case. Finally, leaving none of the players in his case untouched (save the Court—so far), Dekkar in his supplement contends his appointed attorney in the new case was ineffective by failing to object at sentencing to the Court's use of information Dekkar disclosed to the Government at the debriefing session, in violation of the proffer letter.

**A.     Ineffective Assistance of Counsel**

First, Dekkar alleges ineffective assistance of counsel related to the proffer session. He contends that: (1) had he not debriefed as instructed by counsel the Government would not have discovered inculpatory information which led to him receiving a higher sentence; and (2) counsel's instructions and acts in turning over Dekkar's cellphone led to the Government discovering evidence it would not have found, which also resulted in Dekkar receiving a higher sentence.

To prevail on an ineffective assistance of counsel claim, a petitioner must show that his counsel's performance was deficient and that the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Id*. A court's review of counsel's performance must be highly deferential, with a strong presumption that the performance was reasonable. *Id.* at 689; *Little v.*

*Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). A court will not find ineffective assistance of counsel merely because it disagrees with counsel's trial strategy. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). To demonstrate prejudice, a petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors." *Id.*. "The mere possibility of a different outcome is not sufficient to prevail on the prejudice prong. Rather, the defendant must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'" *Id.* at 312-313 (quoting *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997)).

This same two-part standard applies to ineffective assistance of counsel claims arising out of the plea process. *Hill v. Lockhard*, 474 U.S. 52, 57 (1985). Therefore, the movant has the burden of proof and of persuasion to establish that a reasonable probability exists that but for his counsel's ineffectiveness, he "would not have pleaded guilty and would have insisted on going to trial." *Czere v. Butler*, 833 F.2d 59, 63 (5th Cir. 1987) (quoting *Uresti v. Lynaugh*, 821 F.2d 1099, 1101 (5th Cir. 1987)).

### 1. Proffer agreement[2]

In his own words, Dekkar's statement of this claim is:

My attorneys . . . told me to make a proffer, admitting to vastly more conduct than was known by investigators and represented these admissions as part of an immunity deal for which I would for [sic] additional prosecution beyond what was known at the time the proffer was made. They advised me to do this before they knew what information the investigators had, and further did not understand the concept of

---

[2]Among Dekkar's many filings is a Request for Authorization of Discovery (Dkt. No. 93) in which he requests, among other things, a copy of the proffer agreement. The Government attached a copy to its Response, thereby mooting this request. Dkt. No. 94-2. Dekkar's Request also asked for copies of all jailhouse recordings made between himself and the two attorneys who were representing him at the time of his debriefing. Because those conversations, if any, and if available, would be immaterial to the Court's consideration of Dekkar's motion, this request (Dkt. No. 93) is **DENIED**.

> derivative use. As a result, instead of a one count indictment for wire fraud totaling no more than $7,000 in damages, I was charged with 18 counts totaling to nearly $500,000.

Dkt. No. 87 at 7. The attorneys referred to in this claim are the attorneys that Dekkar retained after his arrest on the supervised release warrant. As noted already, though he was arrested based on violations of his supervised release, Dekkar was also under investigation for new crimes. Upon his arrest attorneys for the Government informed Dekkar and his attorneys of the investigation, and of their execution of a search warrant at Dekkar's residence, and offered him the opportunity to discuss those potential charges through a proffer session. Accordingly, though the attorneys were representing Dekkar on the supervised release revocation, to the extent they advised him about the new investigation, they were also representing him on the matters that became the basis of this case.

Dekkar asserts that, if not for the advice of these attorneys, he would not have entered into the proffer agreement, debriefed, and given the Government information it would not otherwise have discovered, and for which he was ultimately indicted and sentenced. Embedded within this argument are two underlying claims. First, Dekkar contends that the attorneys led him to believe—incorrectly—that the proffer letter granted him immunity from prosecution for anything he told the Government during the session. Second, he argues generally that his attorneys were deficient in advising him to participate in the proffer session at all. The Government responds that Dekkar was well-informed that the proffer letter was not an immunity letter, and the attorneys were not deficient regarding their advice on that point. As to the attorneys' advice that Dekkar participate in the debriefing session, the Government argues first that the advice was not deficient, and second, even if it had been, Dekkar was not prejudiced because the Government either already knew of, or had evidence that led them to discover, all of the information Dekkar provided at the debrief.

7

Dekkar's first argument is defeated by the plain language of the proffer letter. It expressly states that, though "no *statements by your client* will be used against your client in the case-in-chief portion of a criminal case against your client . . . the government may make derivative use of *any investigative leads suggested by any statements made by your client*." Dkt. No. 94-2 at 2 (emphasis added). Further, the letter explicitly states that "the Government wants to reaffirm that no promises regarding the disposition of this case are being made at this time." *Id.* In other words, this was very plainly not an immunity letter. Dekkar signed the letter, indicating that he agreed to it. Immediately above his signature is the statement: "The undersigned have read the conditions set forth in the letter of AUSA Michael Galdo dated February 2, 2016 and freely and voluntarily indicate agreement by our signatures below." *Id.* Further, Dekkar's attorney states in her affidavit that "Mr. Florey and I were both in the room when we explained the proffer letter to Mr. Dekkar. He read it, understood it, and signed off on it after careful consideration and explanation by both Mr. Florey and me." Dkt. No. 94-1 at ¶ 5. She added that neither she, her co-counsel, nor the AUSA ever told Dekkar that he was being given any type of immunity. *Id.* at ¶ 8. The undersigned's interactions in court with Dekkar indicate that he is intelligent, and fully capable of understanding the terms of the proffer letter. Further, the affidavit of the attorney who represented him from indictment through sentencing in this case, similarly reflects Dekkar's ability to comprehend such an agreement. He notes that "Mr. Dekkar was an active participant in his defense. I met with Mr. Dekkar extensively at every stage of my representation. We discussed every issue in great detail. . . ." Dkt. No. 96-1 at 2. Dekkar's

claim that his counsel were deficient by failing to explain to him that the proffer letter was *not* an immunity agreement is baseless and should be rejected.[3]

Dekkar's second argument regarding the proffer agreement is that his attorneys were deficient in advising him to debrief with the Government at all, as they did not know what information the Government had, nor did they know what crimes Dekkar had committed, and thus they were unable to make the risk analysis necessary to properly advise Dekkar. He contends he was prejudiced by this because the Government used the information he disclosed at the debrief against him in the case, and specifically in the sentencing hearing, which led to his guideline sentencing range being markedly higher than it otherwise would have been.

Though Dekkar has submitted more than 50 pages of argument on these issues, this particular claim boils down to a single question: was the Government entitled to rely on Dekkar's unauthorized use of a particular credit card—an American Express card issued to Ryan Palmer—in either the indictment or at sentencing? The Government concedes that at his debriefing session, Dekkar informed it about his fraudulent use of the AmEx card. The Government contends it was nevertheless entitled to use that information in Dekkar's case because it did not rely on any of Dekkar's statements at the debriefing in either the indictment or at sentencing, and it proved the crimes committed with the Palmer AmEx card independently, and not through Dekkar's statements

---

[3]Dekkar submits only a single affidavit, from himself, to support his claims (though his briefs are signed with the statement that he "declare[s] under penalty of perjury that the foregoing is true and correct"). *See, e.g.*, Dkt. No. 92 at 12. In neither his affidavit nor any of his briefs does Dekkar directly allege his attorneys told him he was immune from prosecution for anything he said in the debriefing session. Rather, he asserts that in discussing with his counsel whether he should meet with the Government, "both attorneys assured me that anything revealed in a meeting would be protected by an immunity agreement." Dkt. No. 93 at 3. But this took place *before* Dekkar was presented with, and signed, the proffer letter, which offered no immunity whatsoever.

about the AmEx card. This, the Government contends, was permitted by the "derivative use" exception contained in the proffer letter. With regard to this point, the proffer letter stated:

> the government may make derivative use of any investigative leads suggested by any statements made by your client. This provision is necessary in order to eliminate the necessity for a Kastigar hearing wherein the government would have the burden of proving the evidence was derived from a source independent of your client's statements.

Dkt. No. 94-2 at 2. The reference in the letter is to the case of *Kastigar v. United States*, 406 U.S. 441 (1972), in which the Supreme Court considered when the government could use against a witness information it compelled that witness to provide under a grant of immunity, and whether that was permitted under the use immunity statute (18 U.S.C. § 6002). The Court held that if the government wished to use information against a witness it learned after compelling the witness to testify under a grant of immunity, it had to "prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id* at 460. Thus, when Dekkar's proffer letter stated that the provision was "necessary in order to eliminate the necessity of a *Kastigar* hearing," the Government was giving Dekkar and his counsel notice that—as the language expressly states—it was permitted "to make derivative use of any investigative leads suggested by" Dekkar's statements. This was contrasted with the provision in the letter stating that "no statements made by [Dekkar] during the proffer will be used against [him] in the case-in-chief portion of a criminal case. . . ." Dkt. No. 94-2 at 2. The Government contends that so long as it can show that it could prove Dekkar's unauthorized use of the Palmer AmEx card with evidence other than Dekkar's statements, it was permitted to charge that crime, and use it at sentencing. Dekkar argues that this overstates the meaning of the "derivative use" provision. He is incorrect.

Dekkar's entire argument on this point is based on a district judge's decision in *United States v. Lopez*, 605 F. Supp. 2d 852 (S.D. Tex. 2009). That case, however, is inapposite. In that case, the government, through a proffer agreement, obtained information from the defendant regarding the quantity of drugs he had transported, and relied on this information in its sentencing arguments. As the court noted, "the information . . . was first provided to the Government during his debriefing and . . . then merely corroborated at co-defendant Valdez's debriefing." *Id.* at 858. Lopez contended that "merely" corroborating the information with a co-defendant is not enough to demonstrate that the government obtained the information from some source other than the defendant, particularly given that the facts suggested that the "Government simply repeated Defendant's admissions to co-defendant Valdez and asked him if he agreed. . . ." *Id.* at 859. Based on these facts, the court in *Lopez* found that a co-defendant confirming the statements Lopez made at his debriefing was not a sufficiently "derivative" source to permit use of the information against Lopez.

The facts here are quite different. First, there are no co-defendants, and the Government did not simply take Dekkar's information, repeat it to a co-defendant and ask the co-defendant to confirm it. Instead, the Government, pursuant to a warrant it obtained *before* Dekkar's arrest and debrief, searched a car Dekkar had been driving (which he had fraudulently purchased using his father's identity and credit) and found a pair of jeans with the original Macy's store label still on them. The Government then contacted Macy's and learned the jeans had been purchased with the Palmer AmEx card. This led to further inquiries with AmEx, which led to the discovery of many other fraudulent purchases, and many additional victims. This is the very sort of independent evidence that is permitted under a derivative use clause, and is a far cry from the facts of *Lopez*.

11

Dekkar takes his argument a step further and contends that the Government would not have been able to search the car unless he had told them where it was, something he also disclosed during the debriefing session. Dekkar asserts that because he informed the Government about the location of the car in his proffer, any evidence gathered from the car is covered by the proffer and could not be used in the case against him. First, there is no evidence, other than Dekkar's self-serving claims, that without Dekkar telling the Government where the car was the Government would not have located it. The Government had secured a warrant to search the car prior to Dekkar's arrest, and prior to the proffer session. Dekkar's father very much wanted the car found, so that it could be returned to the dealer from which Dekkar had fraudulently purchased it using his father's identity and credit. And the car was not hidden in some hard-to-find location, but instead was found at the car dealership from which Dekkar fraudulently purchased it. Dkt. No. 96-1 at 2. Second, even if the Court assumes that APD would not have been able to locate the Honda without Dekkar telling them where it was, that is irrelevant. The Government did not use of Dekkar's statement regarding the Honda's location against him. The evidence used against Dekkar—his unauthorized use of the Palmer AmEx card—came not from the location of the car, but from what the Government found in it, which it found pursuant to a search warrant obtained *before* any debrief took place. Once again, this is classic "derivative use" of a statement.

Finally, a review of the affidavit supporting the application requesting the search warrant for Dekkar's residence and the Honda, filed on February 2, 2016, *prior* to Dekkar's arrest and proffer, shows that the Government already had knowledge about many additional instances of credit card fraud committed by Dekkar, and knowledge of additional victims. Additionally, the warrant authorized the Government to seize and forensically investigate Dekkar's electronic devices and

computers—which contained information about the Palmer American Express card. Dkt No. 96-2. The evidence the Government gathered about the fraudulent use of the AmEx card was gathered without Dekkar's assistance. *Id.*; Dkt. No. 55, Government's Sentencing Memorandum. Dekkar's proffer did not lead to the additional counts brought against him or to increased exposure in his PSR.

In sum, counsel's advice that Dekkar cooperate and debrief, even if deficient, did not cause Dekkar any prejudice. Dekkar's statements made in that session were not used against Dekkar, and the Government discovered the AmEx card fraud independently of those statements, or had already discovered information that led to it, prior to his proffer. *See Longoria v. United States*, 2015 WL 13387861 (S.D. Tex. March 11, 2015) (counsel's advice that defendant should debrief in an attempt to secure a lower sentence was not deficient).

## 2. Production of cellphone

Dekkar further alleges that one of his attorneys[4] was deficient in her performance for directing a third party, "J.J.", to deliver Dekkar's cell phone to a defense investigator, who in turn delivered the phone to law enforcement. Dkt. No. 87 at 7. Dekkar asserts that "without that phone, the Investigators had no confirmatory evidence besides my statement at the proffer." *Id.* Dekkar

---

[4]This attorney (Olga Seelig) is now a City of Austin municipal court judge. In an *ex parte* motion (Dkt. No. 90), she requests that the Court redact from Dekkar's filings his claims regarding having an alleged relationship with her, noting that the statements are false and Dekkar is a known liar. It is rare that the Court can say this, but Dekkar has been determined to be a pathological liar by any number of fact finders. Dekkar's status as a known liar is underscored by his three fraud convictions in this Court alone. In the past, Dekkar has made countless wildly false allegations, claiming, for example, that he was a law enforcement officer or a member of the University of Texas football team, impersonating both an Emerati prince and the CEO of Gucci, and pretending to be world-renowned soccer star Zinedine Zidane. *See* Dkt. No. 52 at 8-11. He has impersonated U.S. congressmen in phone calls to members of the United States Attorneys Office. *Id.* at 20. Dekkar has absolutely no credibility, and given his dubious reputation in this regard, his (no doubt, false) claims about his prior counsel do not need to be sealed. The Ex Parte Motion for Protective Order (Dkt. No. 90) is therefore **DENIED**.

maintains that Seelig's deficient actions were motivated by anger and jealousy based on his relationship with J.J.

Though this argument has no merit on its substance, the Court need not reach the substance of the argument because, once again, Dekkar cannot show he suffered any prejudice from the phone being delivered to the Government. Specifically, the record reflects that Dekkar's counsel informed the Assistant United States Attorney that Dekkar believed the cellphone was "covered" by the proffer agreement. The AUSA, though he disagreed with counsels' position, elected not to utilize evidence obtained from Dekkar's cellphone in the case, to avoid the very sort of challenge Dekkar is now making. Given this, Dekkar cannot make out an ineffective assistance claim based upon the production of his cellphone.[5]

### 3. Claims against Post-Indictment Counsel

In a Supplemental Complaint, Dkt. No. 100, Dekkar asserts an additional claim of ineffective assistance against the attorney the Court appointed to represented him after the indictment in this case was returned. Dekkar complains that this attorney was ineffective "because he failed to object to the sentencing court's inclusion of information provided by Mr. Dekkar during the proffer hearing with the Government." Dkt. No. 100 at 1. Dekkar asserts that this attorney failed to identify the information used to calculate Dekkar's sentence that was based upon direct, rather than derivative, use of Dekkar's debriefing statements, and failed to object to the evidence that was directly based on statements Dekkar made at his proffer.

---

[5]Moreover, even before the proffer session and subsequent delivery of the phone, the Government already had seized Dekkar's laptop computer pursuant to a search warrant. The data on that laptop included a full electronic backup of Dekkar's cellphone's contents, which is an independent reason why Dekkar cannot show prejudice from the attorney facilitating the delivery of his phone to the Government.

This argument fails, as it is based on the factually incorrect claim that the Court used Dekkar's debriefing statements against him in sentencing. As already set forth at length above, the Government did not obtain the information about the fraudulent use of Palmer's AmEx card through Dekkar's statements at his proffer session. Further, in the proffer agreement the Government expressly retained the ability to "make derivative use of any investigative leads suggested by any statements made by" Dekkar. Dkt. No. 94, GE-2. Indeed, in the affidavit submitted by Dekkar's trial counsel on this motion, he explains that he discussed with Dekkar his view that the AmEx card evidence was obtained independently of Dekkar's statements, that the Government would prevail on this argument at sentencing, and that strategically it was better to focus their sentencing presentation on other issues. Dkt. No. 96-1. He relates that Dekkar agreed: "Mr. Dekkar concluded the Palmer American Express card issue was not a viable issue to contest at sentencing, and he decided to follow my advice in this regard. Mr. Dekkar made the decision to proceed without raising the Palmer American Express card and other issues were raised during sentencing." *Id.*

An attorney's strategic choices, based on a thorough examination of relevant facts and law, are virtually unchallengeable on an ineffective assistance ground. *Jones v. Jones*, 163 F.3d 285, 300 (5th Cir. 1998), cert. denied, 528 U.S. 895 (1999). Moreover, an attorney is not deficient for failing to pursue a losing argument. *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002). Dekkar's argument that his trial counsel was deficient fails.

**B.** **Prosecutorial Misconduct Claim**

Dekkar's final argument relates to alleged conduct of the prosecuting attorney. He claims that the Government violated the proffer agreement, and retaliated against him for contesting the revocation of his supervised release. Dkt. No. 87 at 7. He asserts that the AUSA stated that he was

"going to bring the hammer down on [Dekkar] if he doesn't let this go" and go "full force" because Dekkar exercised his right to contest his supervised release revocation. Dkt. No. 92 at 11; Dkt. No. 95 at 3. Dekkar argues that these comments give rise to a presumption that the AUSA maliciously breached the proffer agreement.

First, in this argument Dekkar continues to make the incorrect claim that the proffer agreement granted Dekkar immunity from prosecution. The Court has already explained in detail that this is a false claim, and it will not repeat that discussion here. Other than the alleged breach of the proffer agreement—something that did not occur—Dekkar fails to identify any other action by the AUSA that amounted to actionable misconduct. Further, and more importantly, Dekkar did not raise this claim on direct appeal. Where a defendant fails to raise a claim on direct review, "the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' . . . or that he is 'actually innocent.' " *Bousley v. United States*, 523 U.S. 614, 622 (1998) (quoting *Murray v. Carrier*, 477 U.S. 478, 485, 496 (1986); *see also United States v. Segler*, 37 F.3d 1131, 1133 (5th Cir. 1994). Here, Dekkar has not demonstrated actual innocence (indeed, he pled guilty), nor does he assert that this claim could not have been presented at an earlier time without further factual development. Accordingly, this claim is procedurally defaulted. *See United States v. Alanis*, 88 Fed. App'x 15, 22 (5th Cir. 2004) (per curiam) (§ 2255 defendant who failed to raise prosecutorial misconduct at trial or direct appeal must show both cause and prejudice for procedural default).

## IV. RECOMMENDATION

Accordingly, the undersigned **RECOMMENDS** that the District Court **DENY** the Motion to Vacate (Dkt. No. 87) in its entirety.

## V. WARNING

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations within fourteen days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

## VI. CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a proceeding under § 2255 "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(B). Pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts, effective as amended to February 1, 2010, the District Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability ("COA") may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595 (2000). In cases where a district court rejected a movant's constitutional claims on the merits, "the petitioner must demonstrate that

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the denial of the movant's § 2255 motion on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Accordingly, a the Court recommends that a certificate of appealability not be issued.

SIGNED this 21st day of February, 2020.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE